# IN THE UNITED STATES DISTRICT COURT FOR
# THE MIDDLE DISTRICT OF TENNESSEE
# NASHVILLE DIVISION

| | |
|---|---|
| AMMED DIRECT, LLC, ) | |
| ) | |
|     *Plaintiff/Counter-Defendant,* ) | |
| ) | No. 3:09-00288 |
| v. ) | |
| ) | |
| LIBERTY MEDICAL SUPPLY, INC., ) | Judge Nixon |
| ) | Magistrate Judge Griffin |
|     *Defendant/Counter-Plaintiff,* ) | |
| ) | |
| and ) | |
| ) | |
| MEDCO HEALTH SOLUTIONS, INC., ) | |
| INC., ) | |
| ) | |
|     *Defendant.* ) | |

## ORDER

Pending before the Court is Plaintiff/Counter-Defendant AmMed Direct LLC's ("AmMed") Motion for Preliminary Injunction ("Plaintiff's Motion") (Doc. No. 4) and Memorandum in Support (Doc. No. 5). Defendant/Counter-Plaintiff Liberty Medical Supply, Inc. ("Liberty") and Defendant Medco Health Solutions, Inc. ("Medco") (collectively, "Defendants") filed a Response in Opposition (Doc. No. 34). The Court held a hearing on April 15, 2009. See (Doc. No. 64, Prelim. Inj. Hr'g, Apr. 15, 2009 (hereinafter "Prelim. Inj. Hr'g")). For the reasons stated below, Plaintiff's Motion is **DENIED**.

## I. BACKGROUND[1]

### A. *Factual Background*

Plaintiff AmMed, based in Nashville, Tennessee, is a diabetes supply company that delivers diabetes testing supplies, products, and medications to the homes of diabetes patients. Defendant Liberty, based in Port St. Lucie, Florida, is also a diabetes supply company and Defendant Medco is Liberty's parent company.

Liberty is the nation's leading home delivery provider of diabetes supplies, providing healthcare services to approximately one million patients. Since 2004, Liberty has acquired approximately 30 medical supply companies, including Medex Medical Supply ("Medex") in July 2008 and Access Diabetic Supply ("Access") and AOM Healthcare Solutions ("AOM") in January 2009. Following the acquisition of each company, Defendants initiate a marketing campaign to attract the acquired company's patients' business. These campaigns involve both written and oral communications with patients to promote Liberty's services and products. Defendants' marketing campaign involving Access and AOM is known as the "Panther Project."

Liberty determines who to contact during a post-acquisition marketing campaign based on when the patient last ordered supplies from the acquired company. An "active patient" is one who received at least one Medicare-covered item during the 15-month period prior to the date on which Liberty contacts the patient. When contacting patients, Liberty informs them that their healthcare service provider has changed and then invites patients to become Liberty customers. Both parties concede that some of the customers they serve receive medical supplies from more

---

[1] The facts in this section are taken from the Parties' Findings of Fact and Conclusions on Law, unless otherwise noted. (Doc. Nos. 69, 70, 73, 91).

than one company. See (Prelim. Inj. Hr'g, at 37: 16-25 and 38:1-5). Defendants also recognize that these circumstances lead to confusion among customers.[2] However, when placing a call to an acquired company's customer, Liberty's patient service representatives do not know whether that particular patient received medical supplies at some point from AmMed as well. Liberty does not have a list of AmMed's customers.

According to AmMed, Liberty began contacting AmMed's patients in August 2008, around the time Liberty acquired Medex. AmMed asserts that Liberty representatives contacted AmMed's patients and informed them that AmMed is going out of business and/or is bankrupt, that Liberty purchased AmMed, and that in order to continue receiving diabetes supplies and medications, AmMed customers must place their orders through Liberty. However, AmMed is an independent and solvent business. Moreover, AmMed claims that Liberty has sent unsolicited medical supplies to AmMed's customers and paperwork instructing AmMed's customers to pay Liberty for these supplies. AmMed discovered Liberty's alleged behavior because AmMed's patients called AmMed's customer service to report that Liberty representatives were calling them and informing them that they needed to place orders with Liberty to continue receiving their medical supplies.

On August 11, 2008, Jeffery Parrish, General Counsel of AmMed's parent corporation, sent a cease and detest letter to Nancy Gregory, Liberty's Assistant Vice President for Compliance, demanding that Liberty cease supplying false information to AmMed patients. (Doc. No. 34, Ex. 8). In response, Keith Jones, Liberty's Chief Operating Officer ("COO"),

---

[2] Defendants assert that it is "not uncommon[] for patients to sometimes be uncertain as to the source of their [medical] supplies." (Doc. No. 34, Ex. 1, at 5).

contacted Mr. Parrish via phone to discuss the allegations and to obtain specific information regarding the complaints. See (Doc. No. 34, Ex. 9). On August 21, 2008, Mr. Parrish sent a follow-up letter to Mr. Jones, accusing Liberty of shipping products to AmMed's customers in addition to the previously mentioned phone and paper communications. (Doc. No. 34, Ex. 9). The letter also included specific information about AmMed's customers who called AmMed to complain that Liberty contacted them. (Id.). Mr. Jones responded to Mr. Parrish in a letter sent September 4, 2008, in which Mr. Jones refuted Mr. Parrish's accusations and informed Mr. Parrish that the AmMed patients who called to complaint about Liberty were also Liberty patients or patients of one of Liberty's acquired companies. (Doc. No. 34, Ex. 10).

According to AmMed, its customers' complaints subsided in late 2008 and AmMed took no further action that year. However, in early 2009, around the time that Liberty acquired Access and AOM and initiated the Panther Project, AmMed claims that their customers expressed that they receiving contact from Liberty that was similar to the contact received by other AmMed customers in August 2008 – that AmMed was going out of business and/or was bankrupt, that Liberty bought AmMed, and in order to continue receiving their supplies, AmMed's customers needed to place orders through Liberty.

According to AmMed, the complaints it received regarding Liberty's conduct increased in number and frequency in 2009. In total, AmMed asserts that it received over fifty (50) complaints from patients in twenty-four (24) different states. (Prelim. Inj. Hr'g, at 13: 24-25). Moreover, AmMed asserts that in addition to contacting patients, Liberty has communicated false information about AmMed's business to healthcare professionals, including staff members in a nurse practitioner's office.
-4-

Liberty asserts that it makes over 22,000,000 outbound calls each year. Since July 2008, around the time that AmMed first noticed complaints from their customers, Liberty made over 16,000,000 outbound calls to patients. In addition, Liberty receives approximately 7,000,000 calls from patients annually. As such, Liberty employs patient services representatives to place and field calls. These employees are provided with a script prior to making or receiving any calls. Liberty also employs trainers, supervisors, managers, and directors to manage customer service and compliance standards.

*B.     Procedural Background*

On March 25, 2009, Plaintiff AmMed filed suit against Liberty and Medco, asserting four (4) claims: (1) unfair competition for false designation of origin under section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a)(1)(A); (2) service name dilution under section 43(c) of the Lanham Act, 15 U.S.C. § 1125(c); (3) unfair competition under Tennessee common law; (4) and commercial disparagement/trade libel under Tennessee common law. As a result of Defendants' alleged conduct, Plaintiff seeks injunctive relief and damages.

The Court held a hearing on April 15, 2009 to discuss Plaintiff's Motion, during which Joseph Wheeler and Benjamin Rose appeared on behalf of AmMed and Christine Miller and Greg Gutzler appeared on behalf of Defendants. See (Prelim. Inj. Hr'g). Thomas J. Milam, AmMed's Chief Operating Officer testified on behalf of AmMed. Keith William Jones, Liberty's Chief Financial Officer, and Angela Gale Landgrebe, a patient services representative, both testified on behalf of Liberty. See id.

AmMed seeks to preliminarily enjoin Liberty and Medco from contacting AmMed's customers or prospective customers, anywhere in the United States, by any means which would

(a) cause the recipient to mistakenly believe that there is a connection, association, or affiliation between Defendants and AmMed; (b) dilute the distinctive quality of AmMed's marks, or the use of any name or marks confusingly similar to AmMed, or from making false designations of origin or unfairly competing with AmMed; (c) state that AmMed is, or has been, in bankruptcy, is contemplating bankruptcy, closing or limiting its operations; (d) state or imply that Defendants have assumed AmMed's contracts, the servicing of AmMed's customers or that AmMed customers may no longer receive supplies from AmMed; (e) otherwise violate section 43 of the Lanham Act; or (f) otherwise constitute unfair competition or commercial disparagement of AmMed.

## II. LEGAL STANDARD

In determining whether to grant injunctive relief, the court must consider four (4) factors: (1) whether movant has a strong likelihood of success on the merits; (2) whether the movant would suffer irreparable injury without the injunction; (3) whether issuance of the injunction would cause substantial harm to others; and (4) whether the public interest would be served by the issuance of a preliminary injunction. Certified Restoration Dry Cleaning Network, L.L.C. v. Tenke Corp., 511 F.3d 535, 542 (6th Cir. 2007) (quoting Tumblebus, Inc. v. Cranmer, 399 F.3d 754, 760 (6th Cir. 2005)); see also Memphis Planned Parenthood, Inv. v. Sundquist, 175 F.3d 456, 460 (6th Cir. 1999); Leary v. Daeschner, 228 F.3d 729, 736 (6th Cir. 2000).

These considerations are "factors to be balanced, not prerequisites that must be met." Certified Restoration, 511 F.3d at 542 (quoting Jones v. City of Monroe, Mich., 341 F.3d 474, 476 (6th Cir. 2003)). However, the Sixth Circuit has held that "a finding that there is simply no

likelihood of success on the merits is usually fatal." Gonzalez v. Nat'l Bd. Of Med. Exam'rs, 225 F.3d 620, 625 (6th Cir. 2000); accord Michigan State AFL-CIO v. Miller, 103 F.3d 1240, 1249 (6th Cir. 1997); McPherson v. Michigan High School Athletic Ass'n, Inc., 119 F.3d 453, 459 (6th Cir. 1997) (overruling district court's preliminary injunction because there was no possibility of success on the merits of plaintiff's claims despite district court's balancing of remaining three factors).

A preliminary injunction is an extraordinary remedy which should only be granted if the movant carries his or her burden of persuasion. Avery Dennison Corp. v. Kitsonas, 118 F.Supp.2d 848, 851 (S.D. Ohio 2000) (citing Stenberg v Cheker Oil Co., 573 F.2d 921, 925 (6th Cir.1978)). Moreover, "the proof required for the plaintiff to obtain a preliminary injunction is much more stringent than the proof required to survive a summary judgment motion" given the extraordinary nature of the remedy and the exercise of power required from the court. Leary, 228 F.3d at 739 (citing Direx Israel, Ltd. v. Breakthrough Med. Corp., 952 F.2d 802, 811 (4th Cir. 1991).

  A. *Likelihood of Success on the Merits*

AmMed asserts that it is likely to succeed on the merits of each of its claims against Defendants. In essence, all of AmMed's claims arise out of the same set of factual allegations: that Liberty's patient services representatives made several miscommunications to AmMed customers regarding AmMed's business. The Court addresses each claim separately.

    i. Section 43(c) of the Lanham Act: Unfair Competition

AmMed alleges that Defendants' conduct constitutes unfair competition under section 43(c) of the Lanham Act for "false designation of origin." In relevant part, the statute states:

> (1) Any person who, on or in connection with any goods or services . . . uses in commerce any . . . false designation of origin, false or misleading description of fact, or false or misleading representation of fact which [] is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection or association of such person with another person, or as to the origin of sponsorship, or approval of his or her goods, services, or commercial activities by another person . . . shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

15 U.S.C. § 1125(a)(1)(A) (2009). According to Plaintiff, Liberty called AmMed's customers and claimed that Liberty had purchased AmMed, that Liberty merged with AmMed, and that Liberty is the successor supplier of diabetes products for AmMed's customers. See (Doc. Nos. 14; 16; 19; 33, Ex. 1 and 2). Plaintiff asserts that such conduct misled AmMed's customers into mistakenly believing that AmMed was associated with Liberty; thereby creating a "false designation of origin" of Liberty's services in the minds of AmMed's customers.

In support of its argument, Plaintiff relies on Register.com v. Verio Inc., 356 F.3d 393, 405-06 (2nd Cir. 2004). In that case, plaintiff was in the business of registering domain names on the internet and defendant, an independent entity, provided web-design services. Id. at 395-96. Defendant obtained plaintiff's customer list and solicited business from plaintiff's customers by making misleading statements regarding its affiliation with plaintiff. Id. at 405-06. The court found two bases for upholding the preliminary injunction: (1) the defendant explicitly referred to the customer's recent registration with plaintiff's company when soliciting plaintiff's customers, thus causing plaintiff's customers to believe that defendant was affiliated with plaintiff; and (2) defendant placed calls to plaintiff's customers immediately after they registered a domain name with plaintiff, adding to the confusion. Id. at 405.

Defendants do not challenge Plaintiff's reliance on nor interpretation of Register.com,

instead, Defendants assert that Plaintiff failed to sufficiently argue that Defendants violated section 1125(a)(1)(A) of the Lanham Act. (Doc. No. 34, at 11). Specifically, Plaintiff failed to argue that Defendants *used* Plaintiff's trademark in a way that confused, or was likely to confuse, customers as to the origin of AmMed's or Defendants' products. Id. In short, Defendants argue that Plaintiff's claims are not recognized under unfair competition for false designation of origin pursuant to section 43(a).

In order to obtain injunctive relief under section 43(a) of the Lanham Act, a plaintiff must show that a "likelihood of confusion" exists among consumers with regard to the parties' trademarks. See Frisch's Restaurants, Inc. v. Elby's Big Boy of Steubenville, Inc., 670 F.2d 642, 647 (6th Cir. 1981). The requirement for "'likelihood of confusion,' is that the public believes that 'the mark's owner sponsored or otherwise approved the use of the trademark.'" Holiday Inns, Inc. v. 800 Reservations, Inc., 86 F.3d 619, 623 (6th Cir. 1996) (citing Carson v. Here's Johnny Portable Toilets, Inc., 698 F.2d 831, 834 (6th Cir. 1983)). In determining whether a likelihood of confusion exists, the Sixth Circuit has identified approximately eight factors for district courts to consider. Holiday Inns, 86 F.3d at 623; see also Frisch's Restaurants, 670 F.2d at 647 (citing Warner Bros., Inc. v. Gay Toys, Inc., 658 F.2d 76, 79 (6th Cir. 1981)). However, an essential element of proof of a Lanham Act violation is defendants' use of plaintiff's mark or a deceptively similar copy of plaintiff's mark. Holiday Inns, 86 F.3d at 625-26 ("the defendants' use of a protected mark or their use of a misleading representation is a *prerequisite* to the finding of a Lanham Act violation") (emphasis in original).

Here, Plaintiffs have not provided direct evidence that Defendants used Plaintiff's mark. Instead, Plaintiff submitted several phone transcripts between AmMed customers as well as

healthcare professionals and AmMed customer service representatives in which AmMed customers and healthcare professionals claimed they received calls, automated voice messages, and letters from Liberty in which Liberty used AmMed's name. (Doc. Nos. 14, 16, 17, 19, 33). However, Plaintiff has not produced any direct evidence of this. During the preliminary injunction hearing AmMed's COO, Thomas Milam admitted that none of his customer service representatives ever heard Liberty personnel say that Liberty had purchased AmMed. (Prelim. Inj. Hr'g, at 26:2-6). Similarly, Mr. Milam conceded that AmMed does not have a single letter from Liberty in which Liberty states that Liberty "bought out" AmMed, despite the fact that AmMed claims its customers have received such letters. (Id. at 29:20-25 and 30:1-10).

Plaintiff also concedes that Defendants' outbound call scripts do not mention AmMed by name, instead they refer to Defendants' acquired companies' names, specifically AOM and Access. (Doc. No. 70, at 10-11); (Prelim. Inj. Hr'g, at 25:23-25, 26:1-6, 29:20-25, 30:1-10, and 33:3-10). In fact, Plaintiff submits an excerpt of Defendants' outbound call script in its proposed findings of fact and conclusions of law:

> Good (morning, afternoon, evening). Access Diabetic Supply and AOM Healthcare Solutions would like to inform you of a change in the provider of your healthcare supplies. Access Diabetic and AOM healthcare Solutions no longer offer these services and have chosen Liberty Medical Supply, the nation's leading home delivery provider of diabetes testing supplies, to assist you with your supply needs.

(Doc. No. 70, at 12). Here, Defendants refer specifically to Access and AOM, not AmMed. Although Defendants' script includes the phrase that there has been a "change in the provider of your healthcare supplies," that phrase is directly preceded and followed by "AOM" and "Access," presumably in an attempt to decrease potential confusion among customers who

receive healthcare supplies from multiple suppliers. Id.

Because Plaintiff failed to produce evidence illustrating that Defendants used Plaintiff's mark or a misleading representation of Plaintiff's mark, Plaintiff cannot succeed on the merits of a violation of section 43(a) of the Lanham Act.

        ii.      Section 43(c) of the Lanham Act: Service Name Dilution

Plaintiff also asserts that Defendants have diluted and tarnished AmMed's distinctive service mark in violation of section 43(c) of the Lanham Act. In relevant part, the statute states:

> Dilution by blurring; dilution by tarnishment (1) Injunctive relief[:]
> Subject to the principles of equity, the owner of a famous mark that is distinctive, inherently or through acquired distinctiveness, shall be entitled to an injunction against another person who, at any time after the owner's mark has become famous, commences use of a mark or trade name in commerce that is likely to cause dilution by blurring or dilution by tarnishment of the famous mark, regardless of the presence or absence of actual or likely confusion, of competition, or of actual economic injury.

15 U.S.C. § 1125(c) (2009). Plaintiff claims that Defendants have used AmMed's "distinctive service mark in a way to tarnish and harm AmMed's reputation." (Doc. No. 5, at 9). Moreover, Plaintiff argues that as a result of Defendants' communications with Plaintiff's customers, Defendants have blurred the distinction between the service marks of both businesses.

Conversely, Defendants argue that Plaintiff failed to make out a claim for service mark dilution because, as a threshold matter, Plaintiff's mark is not sufficiently famous. However, as stated above, the threshold matter is not whether Plaintiff's mark is sufficiently famous, but whether Defendants even used Plaintiff's mark. Holiday Inns, 86 F.3d at 625-26. Again, Plaintiff has not provided direct evidence that Defendants used Plaintiff's mark. As a result, Plaintiff is unable to succeed on the merits of its section 43(c) claim because it failed to show

that Defendants used its mark.

### iii. Tennessee Common Law: Unfair Competition

Plaintiff also alleges a cause of action for unfair competition under Tennessee common law. The Sixth Circuit identified three elements that a plaintiff must prove to make out a claim for unfair competition:

> (1) [that] the defendant engaged in conduct which "passed off" its organization or services as that of the plaintiff; (2) in engaging in such conduct, the defendant acted with an intent to deceive the public as to the source of services offered or authority of its organization; and (3) the public was actually confused or deceived as to the source of the services offered or authority of its organization.

Brainard v. Vassar, 561 F.Supp.2d 922, 937 (M.D. Tenn. 2008) (citing Sovereign Order of Sait Join of Jerusalem, Inc. v. Grady, 119 F.3d 1236, 1243 (6th Cir. 1997)).[3]

Plaintiff asserts that Defendants unlawfully "passed off" their services as those of AmMed's, as evidenced by the calls Plaintiff received from customers and healthcare professionals complaining about Defendants' alleged communication with them. In response, Defendants claim that there is no evidence that shows that Defendants "passed off" its products or services as AmMed products or services. Relying on Hickory Specialities, Inc. v. Forest Flavors, Int'l, Inc., Defendants state that "[t]he term 'passing off' is synonymous with 'palming off.' Both refer to 'false representation tending to induce buyers to believe that the defendant's product is that of the plaintiff.'" 12 F.Supp. 2d 760, 766 n.5 (M.D. Tenn. 1998). Using this

---

[3] There is some conflicting authority with regard to the third element as to whether "actual confusion" or mere "likelihood of confusion" is required. See Men of Measure Clothing, Inc. v. Men of Measure, Inc., 710 S.W.2d 43, 48 (Tenn. Crt. App. 1985) ("[i]t is not necessary to prove that the public has actually been deceived[;] . . . [i]f the court can see that confusion and deception is liable to result . . . it will not refuse injunctive relief because the damage has not already been done") (internal citation omitted). However, this debate is not relevant in the instant analysis.

definition, Defendants argue that Plaintiff's only evidence before the Court amounts to allegations that Defendants made several false statements regarding AmMed's business (i.e., that AmMed is bankrupt, that AmMed went out of business, that Liberty purchased AmMed, etc.). Tennessee common law for unfair competition, according to Defendants, does not extend to such conduct.

The Court finds Defendants' argument persuasive. There is no direct evidence before the Court of such passing off, other than transcripts of calls between AmMed's customers and AmMed representatives complaining that Defendants made certain miscommunications about AmMed's business. (Doc. Nos. 14, 16, 17, 19, 33). However, Plaintiff has not presented proof that Liberty passed off their products and services as AmMed's. Instead, Plaintiff presented evidence that Defendants clearly informed potential customers that Liberty acquired certain other companies and then invited these customers to purchase products and services from Liberty, as shown in the following call script excerpt:

> Good (morning, afternoon, evening). Access Diabetic Supply and AOM Healthcare Solutions would like to inform you of a change in the provider of your healthcare supplies. Access Diabetic and AOM healthcare Solutions no longer offer these services and have chosen Liberty Medical Supply, the nation's leading home delivery provider of diabetes testing supplies, to assist you with your supply needs.

(Doc. No. 70, at 12). Therefore, Plaintiff cannot prevail on a claim of unfair competition under Tennessee common law.

### iv. Tennessee Common Law: Commercial Disparagement and Trade Libel

Lastly, Plaintiff asserts a claim for commercial disparagement or trade libel. To support the claim, Plaintiff argues that its evidence shows that Defendants have made false and

-13-

Case 3:09-cv-00288  Document 99  Filed 09/23/09  Page 13 of 20 PageID #: 2144

disparaging statements to Plaintiff's customers and healthcare professionals. Moreover, Plaintiff claims that Liberty has failed to produce direct evidence that Liberty's statements were never made. As a preliminary matter, Defendants assert that Tennessee common law does not recognize commercial disparagement/trade libel as a cause of action; such a claim should be analyzed under the general defamation action. In addition, Defendants take issue with the fact that Plaintiff relies solely on hearsay and double-hearsay to support its argument. Lastly, Defendants assert that where a defendant's statements convey true concepts supported by true facts, as is the case in the instant matter, the claim for defamation must fail.

Again, the Court finds Defendants' argument persuasive. Although the parties disagree on what Tennessee common law recognizes as a cause of action, the parties do agree on the applicable standard. In order to sustain a cause of action for defamation, a plaintiff must prove that: "(1) a party published . . . a statement; (2) with knowledge that the statement is false and defaming to the other; or (3) with reckless disregard for the truth of the statement or with negligence in failing to ascertain the truth of the statement." Medison America, Inc. v. Preferred Med. Sys., LLC, 548 F.Supp.2d 567, 584. (W.D. Tenn 2007) ("there are no causes of action entitled 'Trade Slander' or 'Commercial Disparagement.'").

In the instant case, Plaintiff has failed to prove that Defendants published a false statement. Instead, Plaintiff presented several affidavits of conversations between AmMed customers and AmMed representatives, not Liberty representatives. (Doc. Nos. 14, 16, 17, 19, 33). Such evidence amounts to hearsay or in some cases, double-hearsay, if Plaintiff offered the evidence for the truth of the matter asserted therein and thus the Court cannot accept it in support of Plaintiff's Motion. Ocean Bio-Chem, Inc. v. Turner Network Television, Inc., 741 F.Supp.

-14-

1546, 1559 (S.D.Fla. 1990) (in denying plaintiff's motion for preliminary injunction and granting defendant's motion for summary judgment, the court rejected plaintiff's multiple affidavits because they contained inadmissible double-hearsay).

Moreover, Defendants presented evidence directly contradicting one of Plaintiff's affidavits. Plaintiff submitted an affidavit of Winona McClainn, an AmMed customer, who claimed that on or about March 13, 2009 at 8:55 a.m., she received an automated call from Liberty indicating that Liberty "bought out" AmMed and that her "physician had authorized Liberty to send [her] diabetic supplies instead." (Doc. No. 16, at 1). In response, Defendants submitted a Declaration from Keith Jones, Liberty's COO, who asserted that according to Liberty's phone records, Liberty placed a call to Ms. McClain on March 13, 2009 at 8:55 a.m., however the automated message did not indicate that Liberty "bought out" AmMed. The automated message and a copy of the CD containing the audio recording reveal the following:

> This is Liberty Medical Supply calling with shipping advice about your recent order. Your order has been approved by your physician and is on its way . . . . If your needs change, if you need to place a repeat order, or if you simply have questions on your account, please call customer service at 1-800-762-8026. For internet subscribers, Liberty can also be reached at www.libertymedical.com . . . . Please remember to review the Welcome to Liberty brochure and complete the authorization of billing form located inside the back cover of the brochure today. Thank you. Goodbye.

(Doc. No. 34, Ex. 1, at 9 and Exs. J, K, H) (complete statement available in Defendants' previously cited documents).

Plaintiff also argues that Defendants have a burden to show that the alleged statements were never made. (Doc. No. 70, at 19). This is incorrect. The burden is on Plaintiff to show that Defendants made false statements; Plaintiff has failed to carry this burden. Instead, Defendants

-15-

refute the allegations by providing evidence that they did not make false statements and that their statements were actually true. In support, Defendants submitted thirty-one (31) declarations from Liberty's patient services representatives – the individuals accused of making the alleged false statements – in which they state under oath that they made no such false statements. (Doc. Nos. 34, Ex. 18; 35, Ex. 1; 35, Ex. 2; 35, Ex. 7; 38, Ex. 1-38, Ex. 22; 39, Ex. 1-39, Ex. 3; 40, Ex. 1; and 40, Ex. 2). As a result, Plaintiff's claim must fail. Medison, 548 F.Supp. 2d at 584 ("[w]hen . . . statements 'convey true concepts . . . supported by true facts,' the defamation action will fail") (quoting Sullivan v. Baptist Mem'l Hosp., 995 S.W.2d 569, 571 (Tenn. 1999)). Therefore, Plaintiff is not likely to succeed on a claim for commercial disparagement or trade libel under Tennessee common law.

Given that Plaintiff is unlikely to succeed on the merits of any of its claims, this factor weighs heavily in favor of Defendants.

*B.     Irreparable Harm*

In order to obtain a preliminary injunction, the movant must demonstrate that failure to receive an injunction is likely to result in irreparable harm. Kallstrom v. City of Columbus, 136 F.3d 1055, 1068 (6th Cir. 1998). The Sixth Circuit states that a plaintiff's harm "is irreparable if it is not fully compensable by monetary damages." Overstreet v. Lexington-Fayette Urban County Gov't, 305 F.3d 566, 578 (6th Cir. 2002).

Relying on Basiccomputer Corp. v. Scott, AmMed asserts that monetary damages are insufficient because the nature of its loss is difficult to calculate. 973 F.2d 507, 511-12 (6th Cir. 1992) (affirming preliminary injunction, in part, because the damages flowing from defendants' action negatively impacted customer goodwill, which is difficult to calculate). Specifically,

AmMed claims that Defendants' actions have caused AmMed to suffer a loss of patient orders and a future loss of patient relationships. According to AmMed, it is virtually impossible to determine how many customers Defendants have contacted and deceived because AmMed only knows about the customers who have proactively contacted AmMed to complain about Defendants' communication with them. Thus, AmMed claims it is impossible to compensate the harm they have experienced due to Defendants' conduct. Moreover, AmMed argues that Defendants' ongoing Panther Project, targeting former Access and AOM customers, is continuing to confuse AmMed's customers and harm AmMed's business. The only solution, according to AmMed, is to enjoin Defendants "from making future misrepresentations that will further harm AmMed's service mark, business reputation, and profitability." (Doc. No. 5, at 13).

In response, Defendants argue that courts should only grant a preliminary injunction upon a showing of "urgent need for speedy action" and that delay in requesting such action undermines a movant's argument for the necessity of such action. Citibank, N.A. v. Citytrust, 756 F.2d 273, 276 (2nd Cir. 1985). In the instant matter, according to Defendants, AmMed first allegedly experienced harm in August 2008, however, AmMed did not file its Motion for Preliminary Injunction against Defendants until almost eight months later, in March 2009.

Defendants' reliance on Citibank, 756 F.2d at 276, is misguided. In that case, the Second Circuit found that "[s]ignificant delay in applying for injunctive relief in a trademark case *tends to* neutralize any presumption that infringement alone will cause irreparable harm . . . and such delay alone *may* justify denial of a preliminary injunction . . . ." Id. at 276 (emphasis added). The Second Circuit's holding merely states that a delay in seeking relief may justify denial of relief, it did not hold that courts must deny relief. Significantly, the delay between the harm and request

for relief in Citibank was approximately four years. Id. at 277. The court based its decision on that fact in addition to the fact that defendants had engaged in behavior similarly harmful toward plaintiffs in the years between the first harm and the request for relief. Id.

The factual scenario present in Citibank that warranted a denial of the preliminary injunction does not exist in the instant case. Here, Plaintiff asserts that Defendants' unlawful conduct began in August 2008, to which Plaintiff's responded with a cease and detest letter. Following an exchange of letters and phone calls between the parties, the alleged conduct stopped. However, Plaintiff claims that the conduct began again when Defendants initiated their Panther Project in early 2009, to which Plaintiff reacted with a Motion for Preliminary Injunction in March 2009. This time line of events does not constitute "significant delay" as defined in Citibank, 756 F.2d at 276.

This Court finds that the irreparable harm factor falls in favor of Plaintiff. Although Plaintiff voices concern of future harm to its business, the Court's decision relies on past and continuing harm. There is no doubt that Plaintiff's customers are confused with regard to Plaintiff's business as a result of oral and written communication they have received from Defendants. See (Doc. Nos. 14, 16, 17, 33). Plaintiff also reports that there has been a decrease in re-orders for the first quarter of 2009 compared to historical re-order rates for prior first quarters. (Doc. No. 64, at 25); see also (Doc. No. 70, at 9). Moreover, Defendants are continuing to make calls to former customers of the companies that Defendants have recently acquired and presumably some of these potential customers are also AmMed's customers.

C. *Substantial Harm to Others*

The third factor to consider is "whether the issuance of the injunction would cause

-18-

substantial harm to others." Tumblebus, 399 F.3d at 760. Both parties focus their arguments on the potential harm to Defendants, however, Plaintiff also raises arguments with regard to third parties. Plaintiff asserts that diabetes patients, healthcare providers, and other competitors' interests are also at stake. According to Plaintiff, diabetes patients, contacted by Defendants, are confused as to their diabetes supplier. However, Plaintiff's argument with respect to third parties does not persuade the Court. Defendants make over 22,000,000 outbound calls a year, yet Plaintiff submitted affidavits from a mere handful of third parties who report confusion as a result of communications from Defendants. These affidavits reflect a minuscule percentage of Defendants' contact with customers and healthcare professionals—an insignificant harm compared with the sheer volume of customers contacted annually by Defendants.

Instead, the Court finds that factor favors Defendants. Defendants conduct is not unlawful and an injunction would force them to unnecessarily alter their policies and training practices. Such an imposition would impose a significant cost and hardship to Defendants, who employ patient services representatives, trainers, supervisors, managers, and directors support the over 22,000,000 outbound patients calls approximately 7,000,000 inbound calls annually. (Doc. No. 34, Ex. 1, at 2).

D. *Impact on Public Interest*

The final factor to consider is the "public interest." This also falls in favor of Defendants. Due to the fact that Plaintiff was unable to show a likelihood of success on the merits, the public interest does not favor injunctive relief. See Waldmann Lighting Co. v. Halogen Lighting Sys., Inc., 28 U.S.P.Q.2d 1682, 1686 (N.D.Ill. 1993) ("[i]f defendant is competing lawfully, the public interest supports the denial of an injunction").

## IV. CONCLUSION

The Court finds that the likelihood of success, the substantial harm to others, as well as the impact on the public interest all fall in Defendants' favor. Although there is evidence before the Court that Plaintiff has suffered harm as a result of Defendants' conduct, the Court cannot grant a preliminary injunction as a result of lawful conduct. United Transp. Union v. Michigan Bar, 401 U.S. 576, 584 (1971) ("an injunction can issue only after the plaintiff has established that the conduct sought to be enjoined is illegal"). The fact that Plaintiff's customers are confused after receiving lawful communication from Defendants does not authorize the Court to issue an injunction. As a result, Plaintiff's Motion is **DENIED**.

It is so ORDERED.

Entered this the  23rd  day of September, 2009.

_____
JOHN T. NIXON, SENIOR JUDGE
UNITED STATES DISTRICT